# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 23-0511V

|  |  |
|---|---|
| JAMES KENNEDY,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 1, 2025 |

*Brian L. Cinelli*, Schiffmacher Cinelli Adoff, LLP, Buffalo, NY, for Petitioner.

*Elizabeth Andary*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

On April 13, 2023, James Kennedy filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") after an influenza ("flu") vaccine he received on October 2, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner more likely than not suffered the residual effects of his injury for more than six months, that he has provided preponderant evidence of onset within 48 hours, and that he has satisfied all of the

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

requirements of a Table SIRVA claim. Petitioner is therefore entitled to compensation under the Vaccine Act.

## I. Relevant Procedural History

On January 30, 2024, Respondent filed a Rule 4(c) Report contending that Petitioner has not met the statutory severity requirement due to a gap in treatment, and that he cannot show that the onset of his pain occurred within forty-eight hours of vaccination. Rule 4(c) Report at 7-10. Respondent also argued that Petitioner had not proven that he had no history of left shoulder symptoms because pre-vaccination medical records had not been filed. *Id.* at 10. Petitioner then filed a Motion for Ruling on the Record ("Mot.") on July 2, 2024. ECF No. 23. Respondent filed a response ("Resp.") on August 30, 2024 and Petitioner filed a reply ("Repl.") on October 7, 2024. ECF No. 24, 27.

The matter is now ripe for adjudication.

## II. Relevant Facts

Petitioner received a flu vaccine in his left deltoid on October 2, 2020. Ex. 2 at 1. He recalled that he "felt a sharp pain in [his] shoulder as soon as the shot was given." *Id*. at ¶6. He "decided to wait a while to see if the pain went away" and took ibuprofen for pain. *Id*. at ¶8.

Mr. Kennedy saw his primary care provider ("PCP") nineteen days later, on October 21, 2020. Ex. 4 at 2. He complained of left shoulder pain that "started after getting a flu shot in that arm about 3 weeks ago."[3] *Id*. An x-ray was ordered, which was normal. *Id.* at 3.

On November 30, 2020, Petitioner saw an orthopedist for "left shoulder pain after getting his flu shot in September 2020." Ex. 6 at 11. On exam, he displayed reduced range of motion and positive impingement testing. *Id*. He was diagnosed with impingement syndrome, prescribed Celebrex and referred to physical therapy. *Id*. at 12. A steroid injection was "deferred." *Id.*

Petitioner began physical therapy on December 8, 2020. Ex. 7 at 84. He reported that his left shoulder symptoms "began after getting a flu shot," and specified that the "pain began immediately." *Id.* He had less than functional range of motion and positive impingement testing. *Id.* at 85-86. Treatment was planned for six weeks and Petitioner was given a home exercise program. *Id.* at 87.

Petitioner returned to the orthopedist on January 11, 2021. Ex. 6 at 8. He reported no change in left shoulder symptoms. *Id.* The doctor ordered an MRI and advised

---

[3] The records from Petitioner's PCP are handwritten, with some illegible portions. *See* Ex. 4.

Petitioner to continue physical therapy. *Id*. at 9. The MRI revealed "[s]train of teres minor myotendinous junction and subjacent chronic cystic erosion of tuberosity margin and subjacent marrow signal heterogeneity," "[s]mall para labral cysts . . . indicating labral tear with scarring," and "[m]ild acromioclavicular joint degenerative disease." *Id.* at 15-16. During a follow-up appointment on January 29, 2021, the orthopedist prescribed a Medrol dosepak and referred Petitioner back to physical therapy. *Id.* at 6.

Petitioner attended his last physical therapy session of this course on March 2, 2021. Ex. 7 at 48. He reported continued difficulty with overhead activities. *Id.* He had made progress toward, but had not reached, his short- or long-term treatment goals. *Id*. Petitioner stated that he "felt [he] had to discontinue physical therapy at that time" due to his campaign for reelection to the Nassau County legislature. Ex. 1 at ¶3, 11. He stated that he continued with his home exercise program and used Advil for pain. *Id*. at ¶11.

Petitioner returned to the orthopedist on March 26, 2021, five months and 24 days after vaccination. Ex. 6 at 2. He reported no change in symptoms. *Id.* The record notes that Petitioner had travel plans the following day and planned to receive a steroid injection in two weeks. *Id.* at 3.

That same day, Petitioner sought a second opinion from a different orthopedist. Ex. 9 at 2. He reported left shoulder pain "starting following [sic] getting a flu shot on 10/2/2020." *Id.* The doctor assessed Petitioner with a rotator cuff strain. *Id.* at 3. He recommended continued physical therapy, home exercises, and ice treatment. *Id*. He stated that he would recommend a cortisone injection if Petitioner's pain did not improve. *Id.* He advised Petitioner to follow-up in four weeks. *Id.*

Petitioner (who was apparently then running for office) returned to treatment "after [the] election concluded in November 2021." Ex. 1 at ¶14. He saw his orthopedist on December 21, 2021 – about nine months after his last appointment. Ex. 9 at 11. He reported "sharp pain with lifting heavy objects," and "stiffness and pain that wakes him up at night." *Id*. Petitioner was encouraged to return to physical therapy and to return in four weeks. *Id.* at 12.

Petitioner returned to physical therapy on March 2, 2022. Ex. 7 at 117. He reported worsening pain and muscle strength "over the past year despite performing [an HEP]." *Id.* He attended nine sessions through April 4, 2022. *Id*. at 88, 91. At his last session, Petitioner reported improvement, but continued trouble lifting above shoulder height. *Id*. at 91.

Petitioner followed up with his orthopedist twice more, on April 15, 2022 and May 20, 2022. Ex. 9 at 6-10. The doctor considered a repeat MRI or arthroscopic surgery if Petitioner's symptoms continued. *Id.*

There are no additional treatment records filed in this matter.

3

Petitioner's wife submitted an affidavit in support of Petitioner's claim. *See* Ex. 3. Ms. Kennedy received a flu vaccine at the same time as Petitioner. *Id.* at ¶4. After the injection, she recalled she and Petitioner talked about "how high up on our shoulders the shot was given and about how much they hurt compared to prior shots." *Id*. at ¶5. She remembered that Petitioner "appeared to be in significant pain and discomfort over the next couple weeks." *Id.* at ¶6. Ms. Kennedy stated that Petitioner "decided to continue with just a home exercise plan" in the "springtime" due to his campaign. *Id*. at ¶7. She stated that his arm was "definitely still bothering him" and she would "observe him being in pain and discomfort on a regular basis." *Id.* at ¶8. She recalled that Petitioner returned to treatment after the election in November. *Id*.

Petitioner's mother-in-law, Lois Schmitt, who resides in an in-law suite in Petitioner's home, also filed an affidavit. *See* Ex. 17 at ¶2. She recalled talking to Petitioner on the evening of his vaccination about the pain he experienced from the injection. *Id*. at ¶4. She remembered that she volunteered to care for Petitioner's children that evening as he "could barely lift his arm." *Id*. at ¶5.

Petitioner's campaign manager, Tom Sullivan, submitted an affidavit in which he described Petitioner's schedule during the election in 2021. Ex. 18. He recalled that Petitioner would visit 50-100 houses per day speaking to constituents from the "beginning of March up until the first Tuesday of November (Election Day)." *Id*. at ¶7. He remembered Petitioner working "from the morning until late at night, five to six times a week during this time period." *Id.*

Jillian DiPreta, the mother of Petitioner's son's friend, also submitted an affidavit. Ex. 21. She stated that Petitioner coached her son's baseball team during the spring and summer of 2021. *Id*. at ¶5. She remembered that, during that season, Petitioner "would mostly be in charge of keeping score in the book in the dugout," because he was "not able to actively coach or participate the way her did before." *Id*.

III.    **Applicable Legal Standards**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at

4

*4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569

F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

## IV.    Findings of Fact

### A.  *Severity*

To satisfy the statutory severity requirement, Petitioner must demonstrate that his SIRVA symptoms continued until at least April 2, 2021 (six months after immediate onset of Petitioner's pain). There is no dispute that Petitioner sought treatment for his shoulder pain through March 26, 2021 (five months and 24 days after vaccination), and then did not seek treatment again for nine months. Respondent argues that this gap in treatment defeats severity, and that Petitioner's attempts to explain it should be disregarded because they were "made in the context of litigation." Resp. at 8.

Respondent seems to suggest that a petitioner must prove continuous symptoms through the *entirety* of a gap in treatment. But the Act requires only that he prove that his symptoms lasted up to the cut-off date – here, *seven days* after Petitioner's two orthopedist appointments on March 26, 2021. The records of both visits that day document ongoing symptoms and contemplated ongoing care, including cortisone injections. Ex. 6 at 2-3 (plan for a steroid injection in two weeks); Ex. 9 at 2-3 (plan to continue physical therapy and follow up in four weeks). Thus, at that time Petitioner continued to experience symptoms that required ongoing treatment, and at least one orthopedist believed that he required treatment for at least an additional month, if not more. It is reasonable on this record to conclude that Petitioner more likely than not suffered continuing symptoms for at least seven days after the orthopedist appointments.

Petitioner has also provided a credible explanation for the gap in treatment between March and December 2021. Petitioner stated that he was running for reelection to the county legislature in 2021, and that he felt he had to stop treatment due to his campaign duties. Ex. 1 at ¶3. Petitioner's campaign manager corroborated Petitioner's statements, by providing details about Petitioner's schedule during that period. Ex. 18 at ¶7. He recalled that Petitioner would visit 50-100 houses per day speaking to constituents from the "beginning of March up until the first Tuesday of November (Election Day)", working "from the morning until late at night, five to six times a week during this time period." *Id.* Petitioner returned to treatment not long after the election in November, when he felt "able to start treating again." Ex. 1 at ¶14. Petitioner's testimony is corroborated in the records as well. When he returned to physical therapy treatment, he reported that his pain had worsened despite performing his home exercises during the interim. Ex. 7 at 117.

Thus, after consideration of the entire record, I find that the evidence preponderates in Petitioner's favor on this issue. Of course, any gaps in treatment, no matter the reason, will be properly considered when determining damages in this case.

### B. *Onset*

Respondent next argues that "the medical records do not establish that Petitioner suffered the first symptoms or manifestation of onset of a shoulder injury within forty-eight hours of his October 2, 2020 flu vaccination." Resp. at 13.

But Respondent's argument ignores several medical records that either relate Petitioner's pain directly to his flu shot, or explicitly state onset occurred within 48 hours of vaccination. *See* Ex. 4 at 2 (left shoulder pain that "started after getting a flu shot in that arm about 3 weeks ago"); Ex. 6 at 11 ("left shoulder pain after getting his flu shot"); Ex. 7 at 84 (left shoulder symptoms "began after getting a flu shot," and specified that the "pain began immediately"). It is well settled that Petitioners need not be perfectly precise in their reporting to satisfy the onset requirement. *See Flowers v. Sec'y of Health & Human Servs.*, 2024 WL 2828211 at *11 (Fed. Cl. Spec. Mstr. May 8, 2024). Petitioner's medical records corroborate onset beginning within 48 hours after vaccination, and there is no evidence suggesting a longer onset.

Further, Petitioner provided affidavit testimony that corroborates Table onset. Both Petitioner and his wife recalled discussing shoulder pain immediately after the vaccination. Ex. 1 at ¶6; Ex. 3 at ¶5. Petitioner also explained that he decided to wait for the pain to resolve, and when it did not, he sought treatment. Ex. 1 at ¶8. Petitioner's mother-in-law, who lives with Petitioner, also stated that she volunteered to watch his

7

children on the evening of the vaccination because of his left shoulder pain. Ex. 17 at ¶4. Accordingly, I find there is preponderant evidence to conclude that the onset of Petitioner's pain began within forty-eight hours of his vaccination.

### C. Prior History of Left Shoulder Pain

Respondent finally argues that "there is not adequate medical documents in the records to address" the first QAI requirement that there be no history of prior left shoulder pain, inflammation, or dysfunction. Resp. at 13. Respondent alleges that Petitioner had not filed sufficient records from three years prior to vaccination and therefore, the QAI requirement cannot be determined. *Id*.

Petitioner filed his pre-vaccination primary care records on November 18, 2024. *See* Ex. 25. Further, although Respondent observed in his Rule 4(c) Report that there were "notes in PT records referencing medical history," he has not pointed to any specific medical records suggesting that Petitioner suffered from pre-vaccination left shoulder symptoms. Rule 4(c) Report at 10. Thus, I find that Petitioner has preponderantly established the first QAI for a Table SIRVA.

## V. Ruling on Entitlement

### A. Requirements for Table SIRVA

I have found that Petitioner has preponderantly established that his pain began within 48 hours of his vaccination and that he had no pain, inflammation, or dysfunction in his left shoulder prior to vaccination. 42 C.F.R. § 100.3(c)(10)(i-ii). Respondent has not contested Petitioner's proof on the remaining elements of a Table SIRVA. *See* 42 C.F.R. § 100.3(c)(10)(i), (iii-iv). Accordingly, I find that Petitioner has provided preponderant evidence to establish that he suffered a Table SIRVA injury.

### B. Additional Requirements for Entitlement

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation. Section 11(c)(1)(C). However, he must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received an influenza vaccine in his left deltoid on October 2, 2020 in New York. Ex. 2 at 1; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that he has not filed any civil action or received any compensation for his vaccine-related injury, and there is no

evidence to the contrary. See Ex. 1 at ¶1; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. See Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master